[No. B116070. Second Dist., Div. Four. Aug. 4, 1999.]

KATHLEEN ANNE EHRET et al., Plaintiffs and Respondents, v. CONGOLEUM CORPORATION et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, the first paragraph, the Factual and Procedural Summary, part II of the Discussion, and the Disposition of this opinion are certified for publication.

**COUNSEL**

Horvitz & Levy, David M. Axelrad, Lisa Perrochet, Stephanie Rae Williams; McHale & Conner, Michael J. McHale and Bruce Janger for Defendants and Appellants.

Davis & Thomas, Joseph Daniel Davis, Thomas D. Thomas and Charlotte E. Costan for Plaintiffs and Respondents.

## OPINION

**KUHL, J.***—Congoleum Corporation (Congoleum) appeals from a judgment entered in favor of the heirs of Robert Ehret (Ehret) in this wrongful death asbestos litigation. Two issues are presented. The first is whether the trial court erred in granting a judgment notwithstanding the verdict (JNOV), eliminating the jury's apportionment of liability to manufacturers of asbestos flooring in addition to Congoleum. In the unpublished portion of this opinion, we find that the jury's verdict was supported by substantial evidence and reverse the trial court's grant of a JNOV. The second issue concerns the proper setoff of settlements entered into by other defendants allegedly at a time when Ehret was still alive and damages for pain and suffering were potentially available. We consider this issue in the published portion of our opinion. We hold that an apportionment of the settlements between economic and noneconomic damages is required. Because Ehret's heirs did not meet their burden of offering evidence to support their proposed good faith allocation of the settlements, we hold that the settlements should be apportioned between economic and noneconomic damages according to the formula set forth in *Espinoza* v. *Machonga* (1992) 9 Cal.App.4th 268 [11 Cal.Rptr.2d 498].

### FACTUAL AND PROCEDURAL SUMMARY

In 1996 Ehret, a journeyman floor covering contractor, was diagnosed with terminal pericardial mesothelioma. He filed suit against several flooring manufacturers and distributors, including Congoleum. He alleged that asbestos in various flooring products he had installed 20 to 30 years earlier caused his illness.

All manufacturers other than Congoleum settled. The settlements totaled $2,565,000. One distributor, L.D. Brinkman & Co. (Brinkman), also remained in the case through trial. Brinkman was successor in interest to A.L. Greenbaum Company, a distributor that allegedly handled the products of flooring manufacturers Congoleum, Amtico, and Flintkote.

During trial, Ehret died. The trial continued as a wrongful death action with Ehret's widow and three other heirs as plaintiffs.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Ehret's deposition testimony was admitted at trial. He testified that he had installed, removed, and sanded asbestos floor covering materials manufactured by Congoleum, Armstrong, Amtico, Azrock, Mannington, Flintkote, and Kentile. He did not use the products of any one manufacturer more than the products of any other manufacturer. He testified that he installed hundreds of thousands of asbestos floor tiles and sheet goods over 20 years of his career. He knew when floor covering and sheet goods that he installed contained asbestos because the packaging was marked as containing asbestos and because he could see the fibers when he cut the material. He recalled that all of the manufacturers started discontinuing use of asbestos at about the same time.

A defense witness and employee of Congoleum, Michael Sapienza, testified that when he started with Congoleum in 1983 he analyzed all competitors' products and they all contained asbestos. Previously, as an employee of Kentile, Sapienza also had analyzed competitors' products and had found them to contain asbestos. In about 1983, Congoleum was in the process of taking asbestos out of its flooring products; other manufacturers were doing the same. Flooring manufacturers did not compete based on the composition of their flooring or how the products were made. Those qualities were similar among the various manufacturers' products. The manufacturers competed based on color and design.

One of Congoleum's defenses was that the asbestos in its flooring was encapsulated in a plastic binder and thus could not have harmed Ehret. However, plaintiffs' expert, Dr. William Longo, testified that broken or sanded floor tiles produced uncoated chrysotile asbestos fibers. Plaintiffs' other expert, Dr. Samuel Hammar, testified that the amount of asbestos to which Ehret was exposed by use of Congoleum's floor tile alone was sufficient to cause mesothelioma, the disease from which Ehret died. For purposes of his opinion, Dr. Hammar assumed that one-fifth or one-sixth of the floor tile to which Ehret was exposed was Congoleum product.

Plaintiffs also offered evidence that Congoleum had supplied products containing asbestos to other flooring manufacturers. There was testimony that Congoleum sold an asbestos felt backing for flooring to Amtico and Mannington. In addition, plaintiffs presented evidence that Congoleum had failed to warn users of potential risks of working with asbestos flooring and that such risks were known or knowable at the time of manufacture.

The jury returned a special verdict, finding in favor of Ehret's heirs and against Congoleum and Brinkman. The jury found that the flooring manufactured by Congoleum was defective, that Congoleum had failed to warn of

a known or knowable potential risk, and that Congoleum's acts were a cause of Ehret's fatal illness. In response to a question that asked the jury to apportion fault for Ehret's fatal illness, the jury assigned 25 percent fault to Congoleum and 12.5 percent each to Armstrong, Amtico, Azrock, Mannington, Flintkote, and Kentile. The jury also found that A.L. Greenbaum Company (the predecessor of defendant Brinkman) distributed the asbestos flooring products of Congoleum, Flintkote, and Amtico. The jury award totaled $3,322,551, consisting of $622,551 for medical and burial expenses and loss of past and future earnings, $2,550,000 for loss of care, comfort and society to Ehret's widow, and $50,000 for loss of care, comfort and society to each of Ehret's three other heirs.

Immediately after the jury's verdict, the court and counsel discussed the need to determine an appropriate offset from the verdict against Congoleum in light of settlements that had been entered into by other defendants. It was agreed that the offset issue would be briefed in a motion filed by Congoleum. Counsel for Congoleum asked the court to require the plaintiffs to produce the settlement documents because "I would need that information for off-sets." Counsel for Ehret's heirs stated that the settlements were confidential, and the court indicated that it could review the settlements in camera. During the colloquy, one of the counsel for Ehret's heirs stated: "By the way, I don't think there's been a single settlement fully effectuated yet, has there?" However another counsel for plaintiffs stated that "all settlements were effected during the time of [Ehret's] life."

Judgment was entered in accordance with the jury's special verdict and notice of entry of judgment was served on June 27, 1997. Thereafter Congoleum and Brinkman filed several posttrial motions.

Congoleum filed a motion to vacate or modify judgment pursuant to Code of Civil Procedure section 663. Congoleum argued that its liability for noneconomic damages should be limited to its percentage of fault pursuant to Civil Code section 1431.2 (commonly known as Proposition 51). Congoleum asked the trial court to reduce the jury's award of economic damages by a portion of the settlements entered into by other defendants before trial, according to the formula set forth in *Espinoza* v. *Machonga, supra,* 9 Cal.App.4th 268 (*Espinoza*). In *Espinoza* the court determined the portion of a settlement to be set off from the economic damages portion of a judgment by applying the percentage of the economic damages award in relationship to the total award of damages. (*Id.* at pp. 276-277.)

In opposition to Congoleum's argument concerning settlement setoffs, Ehret's heirs argued that the court should weigh the various factors that

existed at the time of the settlements and make an allocation of the settlement amounts between the wrongful death and personal injury actions. Plaintiffs argued that such an allocation was required because the settlements were entered into while Ehret was alive and had a viable claim for damages for pain and suffering, but the jury's verdict in the wrongful death action could not include damages for pain and suffering. Plaintiffs suggested that 80 percent of the settlement amounts should be credited to Ehret's personal injury action. Plaintiffs did not present the settlement documents to the court, offer any evidence of the settlement terms, or provide any evidentiary support for their assertion that the settlements were entered into while Ehret was still alive. Plaintiffs offered no evidence in support of their requested allocation of damages (other than a description of Ehret's suffering included in their brief).

On July 9, 1997, Congoleum also filed a motion for new trial, arguing that the damages awarded by the jury were excessive and again seeking offsets for settlements.

Brinkman filed a motion to vacate judgment on July 7, 1997, and a motion for judgment notwithstanding the verdict on July 14, 1997. One ground for Brinkman's motions was that the jury's apportionment of 12.5 percent liability to Flintkote and Amtico was not supported by substantial evidence. Brinkman had an interest in eliminating any apportionment of liability to Flintkote and Amtico because Brinkman was held vicariously liable as a distributor of their products.[1] Brinkman joined Congoleum in arguing that any jury award should be reduced by a setoff for settlements. Brinkman also filed a motion for new trial.

On July 22, 1997, the trial court heard Congoleum's and Brinkman's motions to vacate or modify judgment. After hearing argument on Brinkman's motion, the trial court held that Congoleum had not met its burden of proving that other manufacturers' products contributed to Ehret's injuries. Based on this ruling, the court eliminated apportionment of fault to manufacturers other than Congoleum and ordered that a judgment notwithstanding the verdict be entered.

The trial court also held that apportionment of noneconomic damages pursuant to Civil Code section 1431.2 did not apply in this case (although the court noted the uncertain state of the law regarding the applicability of that section to asbestos cases in light of the fact that the statute applied prospectively only). The trial court also held that the settlements with other defendants should be apportioned between personal injury claims and

---

[1] Brinkman had an indemnity claim against Congoleum.

wrongful death claims so that the portion attributable to pain and suffering was not set off against the jury award. The trial court ascribed 75 percent of the settlements to payment for pain and suffering, ordering that 25 percent of the settlements be subtracted from the jury verdict, resulting in a total verdict against Congoleum and Brinkman in the amount of $2,681,301. On July 29, 1997, the court entered a judgment notwithstanding the verdict in this amount.

On August 22, 1997, the court heard argument on Congoleum's motion for new trial on grounds of excessive damages and denied that motion. The court also heard argument on the remainder of Brinkman's contentions and denied its motion for new trial.

At the August 22 hearing, the court and counsel discussed *Buttram* v. *Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520 [66 Cal.Rptr.2d 438, 941 P.2d 71] (*Buttram*), which had been decided by the California Supreme Court after the July 29, 1997, hearing. The trial judge and counsel agreed that *Buttram* required reversal of the court's prior ruling that Civil Code section 1431.2 did not apply to this case. The court stated that, in light of the applicability of Civil Code section 1431.2, it would restructure the judgment and would revisit the allocation of the pretrial settlements. The court ordered counsel to file additional briefs and set a further hearing date of September 24, 1997.

Congoleum filed a notice of appeal on September 22, 1997. The trial court issued a minute order staying further proceedings in the trial court pursuant to Code of Civil Procedure section 916, subdivision (a) in light of Congoleum's notice of appeal. The September 24 hearing therefore did not proceed.

DISCUSSION

I

*Allocation of Fault to Other Manufacturers**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

II

*Setoff of Settlements*

Ehret's heirs argue that this court may not consider the issue of setoffs to Congoleum's liability based on settlements with other defendants

*See footnote, *ante*, page 1308.

because the trial court has not yet issued a final ruling on that issue. However, the trial court did rule on the issue and later lost jurisdiction to alter that ruling.

Congoleum raised the issue of setoffs in its motion to vacate or modify judgment pursuant to Code of Civil Procedure section 663 and in its motion for a new trial. Brinkman raised the same issue in its motion to vacate judgment. The court heard argument on the motions to vacate on July 22, 1997, and ruled on how the settlements should be applied to reduce the jury's verdict. The trial court's ruling is set forth in its July 29, 1997, order entering a judgment notwithstanding the verdict. Subsequently, on August 22, 1997, the court heard argument on new trial motions, ruled on portions of those motions, and indicated that, based on new case authority, he intended to restructure the judgment with respect to setoff for settlements. However, before the court heard further argument, it lost jurisdiction to alter the judgment.

The trial court lost the power to rule on new trial motions on August 26, 1997, 60 days after service of notice of entry of judgment. (Code Civ. Proc., § 660.) The court already had ruled on the motions to vacate judgment pursuant to Code of Civil Procedure section 663 and, on July 29, 1997, had entered a different judgment applying a setoff that it had determined to be proper. The time within which the court on its own might enter a different judgment notwithstanding the verdict expired at the same time the court lost the power to grant a new trial. (Code Civ. Proc., § 629.)

When an appeal was filed, the effect was to " 'remove[] from the jurisdiction of the superior court the subject matter of the judgment. [Citations.]' " (*Beresh* v. *Sovereign Life Ins. Co.* (1979) 92 Cal.App.3d 547, 552 [155 Cal.Rptr. 74], quoting *Hurst* v. *Hazel Hurst Foundation* (1955) 134 Cal.App.2d 686, 689 [286 P.2d 53].) ■ "During the pendency of an appeal, the trial court is without power to hear a motion to vacate judgment from which an appeal has been taken [citations]." (*Copley* v. *Copley* (1981) 126 Cal.App.3d 248, 298 [178 Cal.Rptr. 842].) The point of the rule is to preserve the status quo while the appeal is decided. (*Pazderka* v. *Caballeros Dimas Alang, Inc.* (1998) 62 Cal.App.4th 658, 666 [73 Cal.Rptr.2d 242].) ■ While the trial court's desire to revisit its prior ruling in light of new law is understandable, the rules provide a finite period of time to alter a jury verdict and then allow an appeal to stay further proceedings in the trial court.

Thus the trial court's opportunity to affect the verdict has ended and the issues of setoff raised in the court below now must be considered on appeal.[3]

After the California Supreme Court's opinion in *Buttram, supra,* 16 Cal.4th 520, it is clear that Civil Code section 1431.2 applies to this case, as Ehret's heirs appear to concede. *Buttram* held that Civil Code section 1431.2, which applies prospectively only, governs a cause of action for damages arising from the latent and progressive disease mesothelioma if the plaintiff was diagnosed with the disease or discovered his injuries subsequent to June 4, 1986, the effective date of Civil Code section 1431.2. Ehret discovered his injuries in 1995, and thus Civil Code section 1431.2 governs this case.

Civil Code section 1431.2 was enacted as part of the Fair Responsibility Act of 1986 (popularly known as Proposition 51). It provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (Civ. Code, § 1431.2, subd. (a).)

Code of Civil Procedure section 877 governs offsets for pretrial settlements reached with joint tortfeasors. It provides in pertinent part: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort . . . it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater."

---

[3]In a motion filed during the pendency of the appeal, Congoleum asked this court to adjudicate the effect on Congoleum's liability of a settlement between Ehret's heirs and Brinkman that took place during this appeal. We decline to do so. Congoleum had notice on December 2, 1998, when Brinkman filed an application for extension of time with this court, that Brinkman had reached a tentative settlement with plaintiffs. Brinkman's appeal was dismissed by this court on January 14, 1999. Yet Congoleum waited until this case was set for argument to ask that the Brinkman settlement be considered on appeal. Ehret's heirs therefore have not had an adequate opportunity to brief this issue. The function of an appellate court ordinarily is to review actions taken by the trial court. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 330, pp. 371-372.) There is insufficient basis for deviating from this general rule in the current posture of this case, particularly where to do so would require the taking of evidence.

The basic principles governing the interplay between Civil Code section 1431.2 and Code of Civil Procedure section 877 are now well established. (See generally, *Poire* v. *C.L. Peck/Jones Brothers Construction Corp.* (1995) 39 Cal.App.4th 1832, 1838 [46 Cal.Rptr.2d 631] (*Poire*).) Under Civil Code section 1431.2, a defendant is only responsible for its share of noneconomic damages as that share has been determined by the jury. "Therefore, a nonsettling defendant may not receive any setoff under [Code of Civil Procedure] section 877 for the portion of a settlement by another defendant that is attributable to noneconomic damages." (39 Cal.App.4th at p. 1838.) After application of Civil Code section 1431.2, ". . . there is no amount that represents a common claim for noneconomic damages against the settling and nonsettling defendants" and thus Code of Civil Procedure section 877 has no applicability to noneconomic damages. (*Hoch* v. *Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 64 [29 Cal.Rptr.2d 615].)

The issue concerning setoffs that is in contention on this appeal is what portion of the settlements should be set off against the economic damages portion of the verdict against Congoleum. Congoleum argues that because Ehret's heirs did not provide the terms of the settlement agreement to the trial court, the entire amount of the settlements should be set off against the economic damages award. In the alternative, Congoleum argues that the court should apply the formula adopted in *Espinoza*, which determines the portion of the settlement to be set off from the economic damages judgment by applying the percentage of the economic damages award in relationship to the total award of damages. (*Espinoza, supra,* 9 Cal.App.4th at pp. 276-277.)

Ehret's heirs contend that, because damages for pain and suffering were available at the time of the settlements but not at the time of trial, the jury's wrongful death verdict does not provide a reliable basis for apportioning the settlement sums between economic and noneconomic damages. Plaintiffs urge that the trial court's apportionment of 75 percent of the settlements to noneconomic damages (pain and suffering) should be upheld.

First, we reject Congoleum's contention that the economic damages award against it must be reduced by the entire amount of the pretrial settlements with other defendants. Congoleum cites cases (e.g., *Dillingham Construction, N.A., Inc.* v. *Nadel Partnership, Inc.* (1998) 64 Cal.App.4th 264 [75 Cal.Rptr.2d 207]; *Erreca's* v. *Superior Court* (1993) 19 Cal.App.4th 1475 [24 Cal.Rptr.2d 156]) holding that a plaintiff who seeks to allocate a settlement among different types of damages must provide the terms of the agreement to the nonsettling parties and demonstrate that the allocation is in

good faith. Congoleum argues there can be no allocation of the settlement sums between economic and noneconomic damages in this case because Ehret's heirs have not disclosed the terms of the settlement agreements.

Congoleum's argument is contrary to *Espinoza.* That case considered the proper offset for a settlement that did not differentiate the amounts attributable to economic and noneconomic damages. Although Code of Civil Procedure section 877 provides that a settlement shall reduce joint tortfeasors' liability by the amount stipulated in the settlement "or in the amount of the consideration paid for it whichever is the greater," *Espinoza* held that, in order properly to implement Civil Code section 1431.2, an undifferentiated settlement must be apportioned between economic and noneconomic damages so that the setoff applies only to economic damages. (*Espinoza, supra,* 9 Cal.App.4th at pp. 274-277.) "To do otherwise would, in effect, cause money paid in settlement to be treated as if it was paid as a joint liability. This could not properly be done on a verdict and we see no basis why it should be done on a settlement." (*Id.* at pp. 276-277.)

■ The absence of a court approved pretrial allocation of a settlement between economic and noneconomic damages does not preclude a court from making a postverdict allocation. (*Greathouse* v. *Amcord, Inc.* (1995) 35 Cal.App.4th 831, 840-841 [41 Cal.Rptr.2d 561]; see *Poire, supra,* 39 Cal.App.4th 1832, 1840-1841 [rejecting the argument that a nonsettling *defendant* lost the right to seek allocation of a pretrial settlement between economic and noneconomic damages by not raising the issue when the court approved the settlement as being in good faith].) Some allocation of an undifferentiated settlement between economic and noneconomic damages is required because only the amount attributable to the joint responsibility for economic damages may be used as an offset.

■ In the absence of any other allocation, *Espinoza* provides that the percentage of economic damages reflected in the jury verdict be applied to determine the percentage of the settlements to be offset. (*Espinoza, supra,* 9 Cal.App.4th at pp. 276-277.) The *Espinoza* formula is now well established. (See, e.g., *McComber* v. *Wells* (1999) 72 Cal.App.4th 512, 517 [85 Cal.Rptr.2d 376]; *Poire, supra,* 39 Cal.App.4th 1832, 1838-1839.)

Second, we hold that, assuming it would be proper for a court to allocate a settlement between economic and noneconomic damages in a proportion different from that reflected in the jury's verdict, Ehret's heirs did not meet their burden of proof in requesting such an allocation. Ehret's heirs had the burden of offering evidence of the terms of the settlements and the timing of the settlements in order to establish the good faith of the allocation they

proposed. They failed to meet this evidentiary burden, and therefore failed to establish a basis for an allocation other than that dictated by *Espinoza.*

It is not yet settled whether and when a trial court can allocate a pretrial settlement between economic and noneconomic damages. In *Espinoza*, the court did not reach the question "whether a trial court presiding over a good faith settlement hearing should make [an allocation of a settlement between economic and noneconomic damages] if it is requested to do so." (*Espinoza, supra,* 9 Cal.App.4th at p. 277, fn. 9, citing Code Civ. Proc., § 877.6.) Similarly, in *Greathouse* v. *Amcord, Inc., supra,* 35 Cal.App.4th 831, the court assumed, but did not decide, that the trial court has power "to determine the amount of a settlement credit in a hearing under Code of Civil Procedure section 877.6 that satisfies due process standards." (*Id.* at p. 841.)

In *Greathouse* the court also held that the *only* appropriate postverdict apportionment of a pretrial settlement between economic and noneconomic damages was the allocation reflected in the jury's verdict (i.e., allocation according to the *Espinoza* formula). (35 Cal.App.4th at pp. 838-841.) "When the issue [of allocation between economic and noneconomic damages] was brought before the court in plaintiffs' posttrial motion, it had already been decided in a fully adversary proceeding—the trial itself. The jury's apportionment of damages between economic and noneconomic damages should be binding on the trial court." (*Id.* at p. 841.) The court nevertheless acknowledged that "[i]n other cases, pretrial settlement may involve elements of damages, such as attorney fees, that have a differential impact on various defendants " and "[did] not reach the complexities presented by such cases." (*Id.* at p. 840, fn. 2.)

We assume without deciding (1) that a trial court presiding over a good faith settlement hearing may allocate a pretrial settlement between economic and noneconomic damages, and (2) that in this case it might be appropriate to allocate the pretrial settlements between economic and noneconomic damages in a proportion different from that reflected in the jury's verdict if damages for Ehret's pain and suffering were available at the time of the settlements but not at the time of the jury verdict.

■ Nevertheless, in order to obtain the benefit of an allocation of the amount of a settlement, the plaintiff is required to make "an evidentiary showing . . . to justify such allocation." (*Erreca's* v. *Superior Court, supra,* 19 Cal.App.4th at p. 1491.) "The statutory requirement of good faith extends not only to the amount of the overall settlement but as well to any allocation which operates to exclude any portion of the settlement from the setoff." (*Knox* v. *County of Los Angeles* (1980) 109 Cal.App.3d 825, 837 [167

Cal.Rptr. 463], quoted with approval in *Erreca's* v. *Superior Court, supra,* 19 Cal.App.4th at p. 1491.) Where there is a complete dismissal of a defendant, and a plaintiff seeks an allocation of the settlement with that defendant for purposes of limiting the setoff against another defendant's liability, the burden is on the plaintiff to establish facts to justify the allocation. (*Knox* v. *County of Los Angeles, supra,* 109 Cal.App.3d at p. 836.)

■ Ehret's heirs did not meet that burden in the court below. Because they sought a postverdict allocation different from the calculation that *Espinoza* prescribes in the absence of a pretrial allocation, Ehret's heirs bore the burden of establishing an evidentiary basis for their proposed allocation. Plaintiffs' argument that a major component of the settlements is attributable to pain and suffering obviously depends critically on whether the settlements were agreed to before or after Ehret died. Moreover plaintiffs' argument assumes sub silentio that the settlements were not structured to reduce the amount payable by a settling defendant if Ehret did not survive trial. Yet plaintiffs did not provide the court with evidentiary support for these critical assumptions.

■ Moreover, the plaintiffs' burden of establishing the good faith of any proposed allocation between economic and noneconomic damages requires plaintiffs to reveal whether any settlement agreement includes an allocation. The good faith of plaintiffs' proposed allocation cannot be determined without knowing whether that proposal is contradicted by any different allocation in the settlement agreement. In making an allocation between economic and noneconomic damages, a plaintiff has an interest in allocating as little as possible to economic damages and a settling defendant has "no incentive to oppose the plaintiff's allocation because [the settling defendant is] entirely unaffected by it." (*Greathouse* v. *Amcord, Inc., supra,* 35 Cal.App.4th at p. 841.) If the settlements in this case included allocations that were less favorable to the plaintiffs than the allocation they requested in posttrial motions, the allocations in the settlements obviously should have affected the trial court's good faith determination.

■ In order to establish a good faith basis for an allocation different from the *Espinoza* formula, Ehret's heirs had the burden of offering evidence of the terms of the settlements, including any allocation therein, and of the timing of the settlements. Ehret's heirs had a full opportunity to offer this evidence before the court made its July 22, 1997, ruling on allocation. Because they failed to meet their burden, the trial court's allocation must be reversed. (See *Contemporary Investments, Inc.* v. *Safeco Title Ins. Co.* (1983) 145 Cal.App.3d 999, 1003, 1005 [193 Cal.Rptr. 822] [party's failure to offer evidence on an issue on which that party had the burden of proof requires reversal].)

Because Ehret's heirs have failed to make out an adequate basis for a good faith allocation of the settlements, and because *Espinoza* requires that there be some allocation of the settlements between economic and noneconomic damages (*Espinoza, supra,* 9 Cal.App.4th at pp. 274-277), we apply the percentage allocation method prescribed by that case. Thus, the computation of the judgment against Congoleum is as follows:

| | |
|---|---|
| Economic damage award to Ehret's widow (18.7% of total damages) | $622,551.00 |
| Minus setoff for settlements by other defendants (18.7% × $2,565,000) | −$479,655.00 |
| Congoleum's liability for economic damages | $142,896.00 |
| Plus Congoleum's share of noneconomic damage award to Ehret's widow (25% × $2,550,000) | +$637,500.00 |
| Plus Congoleum's share of noneconomic damage award to other heirs ($50,000 each × 3 heirs × 25%) | +$ 37,500.00 |
| Congoleum's total liability | $817,896.00[4] |

## DISPOSITION

The trial court's grant of a JNOV is reversed and the case is remanded for the court to enter judgment against Congoleum in the amount of $817,896. Congoleum shall recover its costs on appeal.

Epstein, Acting P. J., and Curry, J., concurred.

---

[4]Congoleum also appeals from the trial court's denial of its motion for new trial. However, Congoleum's brief states that it waives its arguments for a new trial if this court reverses the trial court's grant of a judgment notwithstanding the verdict and permits setoffs for the settlements such that the judgment against Congoleum is no more than $817,896. Because we order entry of judgment in that amount, we do not consider Congoleum's arguments for a new trial.